**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| TRACEY TERRELL GRADY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:20cv54 |
| | ) | |
| OFFICER. B. SMITH, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned United States Magistrate Judge for a recommendation on (i) the "Motion for Summary Judgment" (Docket Entry 51)[1] ("Defendants' Motion") filed by Officer Copple, Officer B. Smith, and Sergeant Jernigan[2] (collectively, the "Defendants") and (ii) the "'Motion for' Summary Judgment in Legal Opposition" (Docket Entry 58)[3] ("Plaintiff's

_____

1  For legibility reasons, this Opinion uses standardized capitalization and spelling and omits the word "the" in front of "Plaintiff" and "Defendants" in all quotations from the parties' materials.

2  Plaintiff initially spelled this defendant's name "Jernnigan" (<u>see, e.g.</u>, Docket Entry 1 at 3), but "Jernigan" constitutes the proper spelling (<u>see, e.g.</u>, Docket Entry 55-1 at 1).  [Docket Entry page citations utilize the CM/ECF footer's pagination.]

3  Because Plaintiff captions this document as a "Motion" in which, "pursuant to Rule 56 of the Federal Rules of Civil Procedure," he "move[s] for summary judgment, in legal opposition, to the Defendants' Motion for Summary Judgment" (<u>id.</u> at 1), the undersigned, in an abundance of caution, treats Plaintiff's filing as a motion.  Nevertheless, "Plaintiff's Motion" and supporting materials more appropriately constitute a response in opposition to
(continued...)

Motion") filed by Tracey Terrell Grady (the "Plaintiff"). For the reasons that follow, the Court should grant Defendants' Motion and deny Plaintiff's Motion (collectively, the "Motions").

## BACKGROUND

Pursuant to 42 U.S.C. § 1983, Plaintiff, an inmate with the North Carolina Department of Public Safety (the "NCDPS"), commenced this action against, inter alia, Defendants for alleged violations of his constitutional rights during his incarceration at Southern Correctional Institution on November 15, 2019. (See Docket Entry 1 (the "Complaint") at 1-42.)[4] In accordance with 28 U.S.C. § 1915A, the undersigned reviewed the Complaint. (See Docket Entry 6 (the "Recommendation") at 1-14.) As relevant here, the Recommendation explained:

> According to the Compliant, on November 15, 2019, [Officer] Smith knowingly violated prison procedure, which allowed only one person in a cell in close custody areas, by opening Plaintiff's cell door and allowing

---

3(...continued)
Defendants' Motion rather than an independent motion for summary judgment in Plaintiff's favor. (See, e.g., id. (asserting that "there exists a genuine issue of material facts which support Plaintiff['s] claims of constitutional violations" and asking the "Court[] to grant summary judgment in favor of Plaintiff [by] granting him a trial by a jury base[d] on the merits of this case"); Docket Entry 59 at 8 (asserting as his "Closing Legal Arguments" that "[t]he nonmoving party should be granted summary judgment considering that there is a genuine issue of material facts that can be presented at a jury trial").)

4 Plaintiff sues Officer Smith and Sergeant Jernigan only in their individual capacities (see id. at 2, 6-7), but sues Officer Copple in both his individual and official capacities (see id. at 16-17).

2

another inmate to enter. (Docket Entry 1 at 6.) That inmate allegedly then attacked and raped Plaintiff. (Id.) It appears that Plaintiff attempts to assert an Eighth Amendment claim against [Officer Smith] for failing to protect him from an assault by another inmate. . . .

\* \* \* \* \*

At this point in the proceedings, Plaintiff sufficiently alleges a claim that [Officer] Smith created a known safety risk by violating a policy designed to protect Plaintiff from that risk. As such, Plaintiff may proceed with a claim against [Officer] Smith for deliberate indifference.

The Complaint next asserts that [Sergeant Jernigan] violated Plaintiff's rights by spraying him in the face as the other inmate attacked him and then taking Plaintiff to a segregated lock up while injured and bleeding. (Docket Entry 1 at 7.) These allegations potentially state claims for excessive force and deliberate indifference to Plaintiff's medical needs. . . .

Although the Complaint does not contain great detail concerning the allegations against [Sergeant Jernigan], it suffices at this point to state claims for relief based on excessive force and deliberate indifference concerning a lack of treatment for Plaintiff's injuries.

(Docket Entry 6 at 4-6.)

The Recommendation further observed:

Separately, the Complaint alleges that [Officer] Copple used excessive force and engaged in cruel and unusual punishment while transporting Plaintiff. Specifically, [Officer] Copple allegedly clamped Plaintiff's handcuffs and leg irons so tightly that Plaintiff lost circulation in his hands and suffered "pain and injuries and marks and [scars]," as well as bruising, on his legs. (Docket Entry 1 at 16.) The Complaint also states that [Officer] Copple spoke disrespectfully to Plaintiff. (Id.) Speaking disrespectfully to a prisoner does not violate the Constitution. However, the remaining allegations sufficiently support claims for excessive force or cruel

3

and unusual punishment at this point in the proceedings and those claims against [Officer] Copple should proceed.

(Docket Entry 6 at 10.)

Accordingly, the Recommendation advised that "Plaintiff's claims for deliberate indifference against [Officer] Smith, excessive force and deliberate indifference against [Sergeant Jernigan], and excessive force or cruel and unusual punishment against [Officer] Copple" should proceed, with all other claims dismissed "for failure to state a claim upon which relief may be granted" and/or due to immunity. (Id. at 12.) The Court (per United States District Judge Catherine C. Eagles) adopted that recommendation. (See Docket Entry 13 at 1.)

The Court (per the undersigned) thereafter entered a Scheduling Order, which established a discovery deadline of April 22, 2022. (Text Order dated Aug. 17, 2021.) In accordance with this Court's Local Rules, see M.D.N.C. LR 56.1(a), Defendants timely filed both a notice of intention to file a dispositive motion and Defendants' Motion (see Docket Entries 44, 49-51; see also Text Orders dated June 22, 2022, and June 24, 2022). Plaintiff neither filed a notice of intent to file a dispositive motion nor filed a timely motion for summary judgment. (See Docket Entries dated Mar. 4, 2022, to Aug. 8, 2022.) Instead, Plaintiff filed Plaintiff's Motion within the time permitted for him to respond to Defendants' Motion. (See Text Order dated July 21,

4

2022; <u>see also</u> Docket Entry 58 at 2.)  Regardless, as relevant to
the Motions, the record reflects:

In November 2019, Officer Smith and Officer Copple served as
NCDPS Correctional Officers, and Sergeant Jernigan served as an
NCDPS Correctional Sergeant, at Southern Correctional Institution.
(Docket Entry 52-2, ¶ 2; Docket Entry 52-3, ¶ 2; Docket Entry 55-1,
¶ 2.)  Per Officer Smith, on November 15, 2019, she "was working in
the Control Booth for the Falkland Unit."  (Docket Entry 52-2,
¶ 3.)  Officer Smith further avers:

> While in the Control Booth, [she] noticed a fight
> between offender Michael Lord [(at times, "M.L.")] and
> [Plaintiff].  Using the radio, [she] called for
> assistance.  Additional staff reported to the area, and
> were able to break up the fight between [M.L.] and
> [Plaintiff].

> [Officer Smith] never "opened" Plaintiff's door as
> he alleged in the Complaint.  At the time of the fight,
> all offenders' doors were opened and they were allowed to
> be in the dayroom.  [Officer Smith] would never open an
> offender['s] door to specifically cause him harm.

> [Plaintiff] is just another inmate to [Officer
> Smith].  [Officer Smith] did not then, and do[es] not
> now, hold any feelings of ill-will towards him.  [She]
> ha[s] never wanted to harm [Plaintiff].  By completing
> the above actions, [she] was merely performing [her]
> Correctional Officer duties.

(<u>Id.</u>, ¶¶ 3-5 (internal paragraph numbering omitted).)

For his part, Officer Copple avers:

> On November 15, 2019, [Officer Copple] heard a call
> for assistance on the radio from the Falkland Unit.
> Multiple staff members responded to the call for
> assistance.  When [Officer Copple] reported to the
> Falkland Unit, [Plaintiff] and [M.L.] were fighting
> inside one of the cells.  Both offenders were given

multiple orders to stop fighting, but neither offender complied with the orders. Unit Manager Harris gave the order to administer OC Pepper Spray as a means of stopping the fight. Other staff members administered OC Pepper Spray, which caused the offenders to stop fighting. Other staff (not [Officer Copple]) placed both offender [sic] in restraints and escorted them to the restrictive housing unit to be decontaminated. [Officer Copple] assisted with the decontamination of [Plaintiff]. While doing so, [Plaintiff] told [Officer Copple] that [M.L.] tried to rape him. He claimed that [M.L.] "wouldn't let me out of my cell" and "held me against my while [sic] and tried to fuck me." [Officer Copple] then notified Sgt. Jernigan of the allegations. Sgt. Jernigan instructed [Plaintiff] to step out of the shower to preserve any evidence. Sgt. Jernigan asked [Plaintiff] what happened, and [Plaintiff] again reported that [M.L.] had tried to rape him. Sgt. Jernigan then notified the [officer in charge (at times, the "OIC")] and medical about the allegations. Both offenders were then placed in separate cells and monitored until seen by medical.

After medical saw [Plaintiff], they determined that he needed to be taken to the local hospital. Another officer and [Officer Copple] prepared to take [Plaintiff] to the hospital. Before leaving for the hospital, [Plaintiff] complained that the handcuffs were too tight. [Officer Copple] had Lt. Goodwin (the OIC) check the tightness of the restraints before [the officers and Plaintiff] left the facility, and he determined that they were tightened appropriately. Thereafter, [Officer Copple and another officer] took [Plaintiff] to the hospital to be evaluated. After the hospital was done with [Plaintiff], [they] brought him back to the facility later that afternoon.

[Plaintiff] is just another inmate to [Officer Copple]. [Officer Copple] did not then, and do[es] not now, hold any feelings of ill-will towards him. [Officer Copple] ha[s] never wanted to harm [Plaintiff]. By completing the above actions, [Officer Copple] was merely performing [his] Correctional Officer duties.

(Docket Entry 52-3, ¶¶ 3-5 (internal paragraph numbering omitted).)

In turn, Sergeant Jernigan avers:

6

As a Correctional Sergeant, [his] main duties are to supervise the correctional officers in [his] unit, supervise the inmates in [his] unit, enforce policy and housing unit rules, and assist other correctional personnel when necessary. [Sergeant Jernigan's] job duties do not include anything medically related. [He] do[es] not have any specialized medical or dental training. The NCDPS Policy Manual states that "[c]linical matters involving medical, nursing, mental health and dental judgments are the sole province of licensed health care providers." NCDPS Policy Manual, Ch. E, Sec. .0207. As such, unless the emergency is apparent, healthcare providers are required to make decisions of which offender to see and when, and how to treat offenders. If it is a readily apparent emergency, [Sergeant Jernigan] can call a Code Blue to request immediate medical assistance.

On November 15, 2019, [Sergeant Jernigan] heard a call for assistance on the radio from the Falkland Unit. Multiple staff members reported to the Falkland Unit. When [Sergeant Jernigan] reported to the Falkland Unit, [Plaintiff] and [M.L.] were fighting inside one of the cells. Both offenders were given multiple orders to stop fighting, but neither offender complied with the orders. Unit Manager Harris gave the order to administer OC Pepper Spray as a means of stopping the fight. [Sergeant Jernigan] administered one one-second burst of OC Pepper Spray and Sgt. Willoughby also administered OC Pepper Spray.[5] After both offenders were sprayed with OC Pepper Spray, they stopped fighting. Staff was then able to place both offender [sic] in restraints. Thereafter, both offenders were taken to restrictive housing to be decontaminated. [Sergeant Jernigan] assisted in escorting [Plaintiff] to restrictive housing. The medical department was promptly notified that both offenders needed a medical evaluation. While being decontaminated, [Plaintiff] told Officer Copple that [M.L.] had raped him. Officer Copple relayed the allegation to [Sergeant Jernigan], and [Sergeant Jernigan] instructed [Plaintiff] to step out of the shower to preserve any physical evidence. [Sergeant

---

5    Per the NCDPS Incident Report regarding this event, Sergeant Jernigan sprayed M.L. with pepper spray and Officer Willoughby sprayed Plaintiff with pepper spray. (See Docket Entry 52-1 at 14.)

Jernigan] asked [Plaintiff] what happened, and he told
[Sergeant Jernigan] that that [sic] [M.L.] had tried to
put his finger and penis in [Plaintiff's] rectum.
[Sergeant Jernigan] immediately notified the
Officer-in-Charge, Lt. Goodwin and medical about the
allegations. Both offenders were then placed in separate
cells and monitored until cleared by medical and the OIC.

[Sergeant Jernigan] only used OC Pepper Spray to
stop the two offenders from fighting. They had been
given multiple direct orders to stop fighting and they
refused. The OC Pepper Spray was effective in getting
the two offenders to stop fighting. [Sergeant Jernigan]
did not use OC Pepper Spray for sadistic or malicious
reason, but instead to restore institutional order and
ensure offender safety.

After the fight ended, the medical department was
promptly notified that both offenders needed to be
medically evaluated. Both offenders were conscious and
able to walk. Neither offender looked seriously injured
beyond the typical injuries associated with a fight
(bumps, bruises, scrapes), except that [Plaintiff] was
missing some teeth. Since [Sergeant Jernigan] do[es] not
have any specialized dental training, [he] did not know
that [Plaintiff's] knocked-out teeth were a
time-sensitive issue. Based on [his] observations,
[Sergeant Jernigan] did not think that [Plaintiff] was in
need of emergency medical care. Therefore, a Code Blue
was not necessary.

[Plaintiff] is just another inmate to [Sergeant
Jernigan]. [Sergeant Jernigan] did not then, and do[es]
not now, hold any feelings of ill-will towards him.
[Sergeant Jernigan] ha[s] never wanted to harm
[Plaintiff]. By completing the above actions, [Sergeant
Jernigan] was merely performing [his] Correctional
Sergeant duties.

(Docket Entry 55-1, ¶¶ 3-7 (certain brackets in original) (footnote

and internal paragraph numbering omitted).)

Conversely, Plaintiff avers:

On November 15th 2019, while house[d] at Southern
C.I. after I return[ed] from work in the kitchen, I came
[into] Franklin Unit, Cell 1 Down, Officer[] Smith

8

unlock[ed] my cell door for me later I went out to get the broom to clean my cell I also ask[ed] the cell block for the mop that's when I return[ed] to my Cell 1 Down and closed the door behind me later I heard a click my cell door was pop and inmate [M.L.] came He notice[d] I was naked changing my wet kitchen clothes so I pull[ed] my pants back on that's when [M.L.] tried to rape me Before I could put my pant[s] on he push his penis in my anus and held me against my will I push[ed] him away and quickly pull[ed] up my pants [M.L.] struck me in the mouth and knock[ed] out my teeth and cut my lip my right eye [was] badly damaged This was not a fight in general [M.L.] tried to rape me. When Sgt. Jernigan, and Sgt. Willoughby, was ordered to pepper spray me by the unit manager Mrs. Harris [M.L.] was on top of me holding me down on my cell bunk bed. Per policy he was in a[n] unauthorized cell the day room was open for inmate[s] to eat and watch T.V. But in close custody at Southern C.I. the policy clearly states one inmate to a cell Officer[] B. Smith was deliberate[ly] indifferent to my safety needs when she fail[ed] to shield and protect me by law when she open[ed] my cell from the control booth she's legally liable for damages she also fail[ed] to act in a timely fashion.

Officer[] Copple[] and Sgt. Jernigan place[d] me in restraints after I was pepper sprayed injured in pain and took me to a decontamination, a hot shower with my clothes and the handcuffs still on I was in agony and pain my right eye was cut laceration my lip was deeply cut my top and bottom teeth were knock[ed] out during the assault that [is] when I told Officer[] Copple I was rape[d] sexually assaulted by inmate [M.L.], 5 hours later I was taken to a hospital it was to[o] late to save my teeth the officers pick[ed] up of[f] my cell floor They took my wet clothes finally and told me a police [officer] was going to talk with you. Note about the rape and the assault later I spoke with L.T. Higgins from Troy police who did a 30 minute investigation and later charged me with false allegations and filing a false report to police after going to court for the charge the head District Attorney dismiss[ed] the charge but [Defendants'] attorney fail[ed] to enclose this information in discovery but he chose to mention incriminating statements about my pending charges biasly [sic] to poison the minds of potential jurors my civil and constitutional rights ha[ve] been clearly violated I've suffered cruel and unusual punishment a[n] Eighth

9

Amendment violation pain and suffering through neglect and deprivation while house[d] at Southern C.I. a hostile living environment[.]

(Docket Entry 59 at 10-11; <u>see generally</u> <u>id.</u> at 9-12 ("Plaintiff's Declaration").)

Plaintiff also submitted, inter alia, prison disciplinary records related to the incident on November 15, 2019. (<u>See</u> Docket Entry 59-4 at 1 to 5.) These records reflect that inmate M.L. pleaded guilty to charges of disobeying an order from prison staff and "fight[ing] or engag[ing] in a mutual physical confrontation . . . resulting in outside medical attention" (<u>id.</u> at 5). (<u>See</u> <u>id.</u> at 4-5.)[6] The records further reflect that, although an investigation found grounds to lodge the same charges against

---

6 In his post-incident witness statement, M.L. reported:

I was sitting in the Block watching TV when [Plaintiff] came in the Block. He went to his room then came out and grabbed the broom and swept his room. Then he came out and looked at me and said I will kill you. I looked back to see who he was talking to when he said you nigger. He then walked to his room. I got up and walked to his room and said who you talking to old school. He said do it look like I'm talking to you. I said man why ever you mad I don't have nothing to do with that. He stated man I can't hear you come in the room. As soon as I walked in the room he made a step towards me and I felt uneasy so I pushed the door back open. Then he grabbed me and was pinning me up against the wall like he wanted to fight me then I struck him and we began to fight. The fight proceeded out of the room then back into the room the[n] the officers sprayed us.

(Docket Entry 52-1 at 31; <u>see also</u> <u>id.</u> at 12-13 (providing similar account and clarifying that Plaintiff told M.L. to "step in the room and close the door I cannot really hear what you are saying").)

Plaintiff, prison officials subsequently "dismissed [Plaintiff's case] due to a time frame violation" (id. at 3). (See id. at 1-3.)

Finally, Defendants submitted the surveillance video from Plaintiff's cellblock on November 15, 2019. (See Docket Entries 53, 53-1, 56.) As relevant here, the surveillance video reflects:

At 8:24 a.m., inmates, including M.L., sit and/or stand around tables in the middle of the bottom tier[7] of a two-level cellblock watching a television affixed to the upper portion of a column in the center foreground of the video. A broom, a dustpan, and a mop rest at or near the base of that column, on the side between the column and the cellblock entrance door, a portion of which appears at the lower left corner of the video frame. A trashcan rests at the base of the column, under the television, on the side facing the inmates watching the television. Just inside the cellblock entrance, an inmate talks on the telephone in the lower left corner of the video frame, near the bathrooms that comprise the left wall of the cellblock. Some cellblock doors stand open (ranging from slightly ajar to fully open)[8] while other doors remain closed.

---

7  The area contains three tables, one in front of a column against which M.L. leans when Plaintiff enters the cellblock and two tables behind that column; inmates only occupy the area around the two tables on either side of the column when the video commences.

8  The doors operate on hinges, opening outward into the cellblock, with a range of approximately 180 degrees.

11

At 8:24:47, inmates start appearing at the bottom left of the video frame, entering through the partially visible cellblock entrance. Plaintiff enters the frame at 8:24:48 and walks directly to the first cell on the back wall beside the lower tier bathroom. He pulls open the door and steps into the cell before immediately turning around and exiting the cell to walk into the bathroom, leaving his cell door wide open. During Plaintiff's time in the bathroom, M.L. sits in the chair immediately in front of the column against which he had been leaning. At 8:25:27, Plaintiff walks out of the bathroom and goes directly to the table behind the one where M.L. sits, pausing momentarily before he turns around and walks directly to the front column, where he grabs the broom and, at 8:25:49, walks back into his cell, the door of which remains open.[9] As he enters the cell, Plaintiff pulls the door almost shut behind him, but it swings back slightly ajar. At 8:26:40, Plaintiff pushes the door open (to more than a 90-degree angle) before he sweeps debris out of his cell.

At 8:26:50, as he pushes the broom back to the column from which he took it, Plaintiff stares in the direction of the tables where the inmates sit watching television. He continues to look in that direction as he approaches the column before he grabs the broom and starts walking back towards his cell, still looking

---

9  Plaintiff originally opened the door nearly 180 degrees, but during his absence, it slowly started closing, coming to a rest at slightly less than a 90-degree angle.

12

towards the inmates watching television, before he again changes direction and takes the broom back to the column while continuing to look towards those inmates.[10]  At 8:26:57, Plaintiff places the broom against the column and turns back towards his cell, as M.L. looks over his shoulder in the direction of an inmate leaning against the railing in the upper tier.  At 8:27:02, Plaintiff reaches his cell and pushes the door open wider as he continues to look in the direction of the sitting inmates.  Although a pipe partially obscures the view, it appears that Plaintiff says something towards those inmates before he walks into his cell at 8:27:03, pushing the door open even farther, to nearly 180 degrees.

Two seconds later, Plaintiff steps back out of his cell, turning in the direction of the watching inmates, nodding and saying something in their direction.  As this occurs, Plaintiff's door starts to swing back towards him, but at 8:27:09, Plaintiff pushes the door open to approximately 180 degrees again.  Concurrently, M.L. twists around in his chair to look behind him before glancing back at Plaintiff as Plaintiff starts walking back into his cell at 8:27:11.  Although a wall largely obscures the view, it appears that Plaintiff turns around and sits down on the bed in his cell, facing in the direction of M.L., who remains seated at the table.  The video does not clearly reveal whether

---

10  The video does not clearly indicate whether or not Plaintiff says something to those inmates.

13

Plaintiff maintains a line of sight on M.L. through the open cell door, which starts slowly swinging closed.

Regardless, at 8:27:17, one second after Plaintiff appears to finish sitting down, M.L. starts to get up from the table. M.L. walks directly to Plaintiff's cell, the door of which remains open nearly 90 degrees. At 8:27:25, M.L. steps around the open door and, by 8:27:27, steps into the cell threshold. At 8:27:28, Plaintiff stands in his cell facing M.L., moving closer to M.L. by 8:27:29. The two stand face-to-face for a few seconds, apparently engaged in a verbal exchange, before M.L. at 8:27:34 turns to pull the cell door closed. The cell door closes at 8:27:36 before immediately popping back open (at 8:27:37) revealing (at 8:27:38) M.L. stepping backwards through the doorway away from Plaintiff. By 8:27:39, Plaintiff and M.L. commence exchanging blows and, by 8:27:46, although he and Plaintiff maintain their grasp on each other, M.L. has pivoted and forced Plaintiff out of the cell, while M.L. remains inside it.

At 8:27:47, M.L. frees his arm and punches Plaintiff, at which point the two inmates break apart, with Plaintiff outside his cell and M.L. inside the cell. Gesturing, Plaintiff advances on the doorway to his cell and stands in the threshold for a few seconds while M.L. remains a few feet inside the cell, with neither inmate touching the other. At 8:27:53, Plaintiff and M.L. resume their physical altercation, with Plaintiff in the cell threshold. At

14

8:27:59, they move into the cellblock, still hitting each other. They continue fighting outside Plaintiff's cell until, at 8:28:11, the first prison official, Officer Armstrong (see Docket Entry 52-1 at 17), enters the bottom of the video frame. As Officer Armstrong heads towards them, Plaintiff and M.L. reenter Plaintiff's cell, still fighting.

By 8:28:15, Plaintiff, M.L., and Officer Armstrong have all entered Plaintiff's cell. Plaintiff and M.L. continue fighting on or near Plaintiff's bed as, at 8:28:29, other officers start entering Plaintiff's cell. By 8:28:30, Sergeant Jernigan stands at Plaintiff's cell's threshold, which he fully enters shortly thereafter as Plaintiff and M.L. continue to fight, and by 8:28:42, Sergeant Jernigan, Plaintiff, and M.L. have moved out of sight inside Plaintiff's cell. At this point, the cell contains three officers (Officer Armstrong, Officer Willoughby, and Sergeant Jernigan), with multiple additional officers gathered outside the cell. At 8:28:49, Officer Armstrong exits the cell, with his shirt covering his nose; as he starts towards the cellblock exit, he looks downwards with his hand cupped near his mouth. By 8:29:03, Sergeant Jernigan starts walking towards the cell door with Plaintiff. At 8:29:06, Plaintiff walks through his cell door with his hands behind his back, and Sergeant Jernigan escorts him through the cellblock doorway and out of the video at 8:29:13. Sergeant Jernigan returns to the cellblock seven seconds later and

15

walks back into Plaintiff's cell. Sergeant Jernigan escorts M.L. out of Plaintiff's cell at 8:29:45 and out of the cellblock at 8:29:51. The other officers start following Sergeant Jernigan and M.L. out of the cellblock, with one officer closing Plaintiff's cell door as she departs. In the approximately two minutes that elapsed from the start of Plaintiff and M.L.'s physical altercation to M.L.'s departure from Plaintiff's cell, at least sixteen prison officials entered the cellblock. Notably, Plaintiff and M.L. remain fully clothed in all of their on-screen interactions and during their escort from the cellblock.

Finally, the parties submitted copies of paperwork related to various grievances that Plaintiff filed in the fall of 2019. (See Docket Entry 52-1 at 85 to 93; Docket Entry 59-3 at 2 to 14.) Plaintiff pursued two grievances related to the incident on November 15, 2019, through "Step Three" of the NCDPS Administrative Remedy Procedure (at times, the "ARP"). (See Docket Entry 52-1 at 85 to 93.) In these grievances, he maintains, as relevant here, that (i) staff unlocked his cell door and failed to protect him from M.L. and (ii) he did not receive medical attention in a sufficiently "timely fashion to save [his] teeth" (id. at 91). (See id. at 86, 91.) Plaintiff also submitted a "Screening Response" dated September 27, 2019, "Regarding Grievance No.: 4860-2019-KPODF-11801," which states that the grievance "has been accepted and will begin a review process," with a response "sent

16

within 15 calendar days of 09/27/2019," as well as a "Screening Response" dated September 30, 2019, "Regarding Grievance No.: 4860-2019-KPODF-11817." (Docket Entry 59-3 at 11 to 12 (emphasis omitted).) The latter response states:

> The grievance you have submitted is being rejected for the following reason:
>
> - Active Grievance in Process
>
> Rejection Justification:
>
> The Administrative Remedy Procedure, Section .0300 of the North Carolina Department of Public Safety Prisons Policy and Procedures, provides:
> .0304 Submission of Grievances
> (b) An inmate may submit a new grievance after a pending grievance has completed Step 2 review or has been resolved.

(Id. at 12 (formatting in original).) Notably, both responses identify Plaintiff's location as Scotland Correctional Institution rather than Southern Correctional Institution. (See id. at 11-12.)

## DISCUSSION

### I. Relevant Standards

### A. Summary Judgment Standards

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the

17

absence of such dispute.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).  In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)).  If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

Nevertheless, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.  Moreover, "the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." Lewis v. Eagleton, No. 4:08-cv-2800, 2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (citing Baber v. Hospital Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992)),

aff'd, 404 F. App'x 740 (4th Cir. 2010); see also Pronin v. Johnson, 628 F. App'x 160, 161 (4th Cir. 2015) (explaining that "[m]ere conclusory allegations and bare denials" or the nonmoving party's "self-serving allegations unsupported by any corroborating evidence" cannot defeat summary judgment). Further, factual allegations in a complaint or other court filing constitute evidence for summary judgment purposes only if sworn or otherwise made under penalty of perjury. See Reeves v. Hubbard, No. 1:08cv721, 2011 WL 4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011), recommendation adopted, slip op. (M.D.N.C. Nov. 21, 2011).

Ordinarily, "where affidavits present conflicting versions of the facts which require credibility determinations, summary judgment cannot lie." Raynor v. Pugh, 817 F.3d 123, 130 (4th Cir. 2016) (internal quotation marks omitted). Yet, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007); see also, e.g., Love v. Beasley, 788 F. App'x 935, 937 (4th Cir. 2020) (concluding, on review of summary judgment decision, "that the district court did not err in finding that [a defendant] did not punch [the plaintiff] as alleged, because video of the incident confirms [the defendant's]

denial"). As the United States Court of Appeals for the Fourth Circuit explained, in <u>Scott</u>,

> the [United States] Supreme Court was faced with a videotape of the incident in question that "utterly discredited" the plaintiff's account, rendering it a "visible fiction." 550 U.S. at 380-81. As between a videotape of undisputed authenticity, *id.* at 378, and the plaintiff's story, the Court held, the videotape should prevail. Where the nonmoving plaintiff's account is "blatantly contradicted by the record" so that "no reasonable jury could believe it," it should not be adopted by a court ruling on a motion for summary judgment. *Id.* at 380.
>
> As [the Fourth Circuit] ha[s] clarified, *Scott* is the exception, not the rule. . . . Summary judgment is proper under *Scott* only when there is evidence — like the videotape in *Scott* itself — of undisputed authenticity that shows some material element of the plaintiff's account to be "blatantly and demonstrably false." *Blaylock v. City of Phila.*, 504 F.3d 405, 414 (3d Cir. 2007) (refusing to extend *Scott* to evidence in form of police photographs that fail to depict "all of the defendant's conduct and all of the necessary context"); *see also Witt[ v. West Va. State Police, Troop 2,]* 633 F.3d [272,] 277 [(4th Cir. 2011)] (holding *Scott* inapplicable to soundless video that does not capture key disputed facts).

<u>Harris v. Pittman</u>, 927 F.3d 266, 275-76 (4th Cir. 2019) (parallel citations omitted).

**B. Eighth Amendment Standards**

As long recognized, "[t]he Eighth Amendment protects prisoners from 'unnecessary and wanton infliction of pain.'" <u>Thompson v. Commonwealth of Va.</u>, 878 F.3d 89, 97 (4th Cir. 2017) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 103 (1976)). "That protection imposes on prison officials an affirmative 'obligation to take reasonable measures to guarantee the safety of . . . inmates.'"

20

Id. (ellipsis in original) (quoting <u>Whitley v. Albers</u>, 475 U.S. 312, 320 (1986)).

### i. Failure to Protect Claims

As the Supreme Court has observed, prisons both house "persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct" and "strip[]" inmates "of virtually every means of self-protection." <u>Farmer v. Brennan</u>, 511 U.S. 825, 833 (1994) (certain brackets in original) (internal quotation marks omitted). Accordingly, "the government and its officials are not free to let the state of nature take its course." <u>Id.</u> "Prison conditions may be 'restrictive and even harsh,' but gratuitously allowing the beating or rape of one prisoner by another serves no 'legitimate penological objective,' any more than it squares with 'evolving standards of decency.'" <u>Id.</u> (brackets, citations, and certain internal quotation marks omitted). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" <u>Id.</u> at 834.

Thus, prison officials must take reasonable measures to guarantee inmate safety. "In particular, . . . prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." <u>Id.</u> at 833 (second ellipsis in original) (internal quotation marks omitted). "It is not, however, every injury suffered by one prisoner at the hands of another that

21

translates into constitutional liability for prison officials responsible for the victim's safety." Id. at 834. Instead, "a prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, 'sufficiently serious[;]' a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" Id. (citations omitted). "For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." Id.

Second, the prison official must possess a "'sufficiently culpable state of mind.'" Id. "In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety." Id. "[D]eliberate indifference entails something more than mere negligence," but "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Id. at 835; see also id. (explaining "that Eighth Amendment liability requires 'more than ordinary lack of due care for the prisoner's interests or safety'"). "The [Supreme] Court [has] held that deliberate indifference in this context lies somewhere between negligence and purpose or knowledge: namely, recklessness of the subjective type used in criminal law." Brice v. Virginia Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995); see also id. at 105 n.2 (contrasting "'civil-law' recklessness, under

22

which a person is judged reckless if he acts in disregard of an unjustifiably great risk of harm of which he knew or should have known").

### ii. Excessive Force Claims

However, "application of the deliberate indifference standard is inappropriate in one class of prison cases:  when officials stand accused of using excessive physical force." Farmer, 511 U.S. at 835 (internal quotation marks omitted).  "In such situations, where the decisions of prison officials are typically made in haste, under pressure, and frequently without the luxury of a second chance, an Eighth Amendment claimant must show more than 'indifference,' deliberate or otherwise." Id. (citation and certain internal quotation marks omitted). Rather, "[t]he claimant must show that officials applied force 'maliciously and sadistically for the very purpose of causing harm . . . .'" Id. Thus, in evaluating an eighth-amendment excessive force claim, the Court "must determine 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" Thompson, 878 F.3d at 98 (quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992)).  In conducting this analysis, the Court considers "whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." Iko v.

23

Shreve, 535 F.3d 225, 238 (4th Cir. 2008) (internal quotation marks omitted).

Notably, a prisoner need not suffer a significant injury to prevail on an excessive force claim. See Thompson, 878 F.3d at 98; see also Hudson, 503 U.S. at 9 ("When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident." (citation omitted) (citing Whitley, 475 U.S. at 327)). "The excessive force analysis thus focuses on the maliciousness of the force used, not the severity of the injury that results from that force." Thompson, 878 F.3d at 101; see also Wilkins v. Gaddy, 559 U.S. 34, 38 (2010) ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."). As the Fourth Circuit recently explained:

> Although [courts] once considered the severity of an inmate's *injuries* under the objective component, the Supreme Court has clarified that what matters is the severity of the *force* employed. So long as the force used is more than de minimis, the objective component is satisfied, regardless of the extent of the injury.

Dean v. Jones, 984 F.3d 295, 303 (4th Cir. 2021) (emphasis in original) (citation omitted).[11]

---

    11 Nevertheless, "the extent of injury may supply insight as to the force applied." Cowart v. Erwin, 837 F.3d 444, 453 (5th Cir. 2016).

24

As for the subjective component, "[t]he state of mind required in excessive force claims is 'wantonness in the infliction of pain.'" Iko, 535 F.3d at 239 (quoting Whitley, 475 U.S. at 322); see also id. ("Put differently, the 'core judicial inquiry' regarding the subjective component of an excessive force claim is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" (quoting Hudson, 503 U.S. at 7)). The Supreme Court has identified four factors to assist courts in determining whether an officer acted with "'wantonness'":

> (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) "any efforts made to temper the severity of a forceful response."

Id. (quoting Whitley, 475 U.S. at 321). "From such considerations inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." Whitley, 475 U.S. at 321.

### iii. Medical Deliberate Indifference Claims

In turn, to establish a constitutional claim regarding medical care, an inmate must show that a prison official "acted with 'deliberate indifference' (subjective) to [his] 'serious medical needs' (objective)." Iko, 535 F.3d at 241 (citing Estelle, 429

U.S. at 104). A medical need qualifies as serious if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. (internal quotation marks omitted). A defendant displays deliberate indifference where he possesses knowledge of the risk of harm to an inmate and knows that "his actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs." Id. (emphasis and internal quotation marks omitted); see also Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) ("To prove deliberate indifference, plaintiffs must show that 'the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'" (brackets in original) (quoting Farmer, 511 U.S. at 837)).

As noted, "deliberate indifference entails something more than mere negligence, . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835. "It requires that a [defendant] actually know of and disregard an objectively serious condition, medical need, or risk of harm." De'lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013) (internal quotation marks omitted). A plaintiff can satisfy this standard by showing "that a [defendant] knew of a substantial risk from the very fact that the risk was obvious." Scinto, 841 F.3d at 226 (internal quotation marks omitted). In addition, "'[f]ailure to

26

respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs.'" Id. (brackets in original) (quoting Miltier v. Beorn, 896 F.2d 848, 853 (4th Cir. 1990), overruled in part on other grounds by Farmer, 511 U.S. at 837).

### C. Exhaustion Requirement

Finally, as Plaintiff initiated this action while an NCDPS inmate (see, e.g., Docket Entry 1 at 2), the Prison Litigation Reform Act (the "PLRA") applies. Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion "is mandatory" and courts lack discretion to waive the exhaustion requirement. Woodford v. Ngo, 548 U.S. 81, 85 (2006). Moreover, the "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). The defendant bears the burden of establishing that a prisoner failed to exhaust administrative remedies. See Jones v. Bock, 549 U.S. 199, 216 (2007) ("We conclude that failure to exhaust is an affirmative defense under

27

the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints.").

Nevertheless, the "exhaustion of administrative remedies under the PLRA is a question of law to be determined by the judge." Drippe v. Tobelinski, 604 F.3d 778, 782 (3d Cir. 2010); see also Woodhouse v. Duncan, 741 F. App'x 177, 178 (4th Cir. 2018) ("'[J]udges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury.'" (quoting Small v. Camden Cnty., 728 F.3d 265, 271 (3d Cir. 2013)) (brackets in original)); Lee v. Willey, 789 F.3d 673, 677 (6th Cir. 2015) ("[A]ll . . . of the circuits that have considered the issue agree that judges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury." (internal quotation marks omitted)). A prisoner satisfies the PLRA exhaustion requirement when he "ha[s] utilized all available remedies 'in accordance with the applicable procedural rules,' so that prison officials have been given an opportunity to address the claims administratively." Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008) (quoting Woodford, 548 U.S. at 88). Thus, the relevant prison's grievance procedures determine the steps that a prisoner must take to meet his exhaustion obligations. See id. at 726.

Moreover, prisoners must exhaust their administrative remedies even if the administrative process does not offer the type of relief that they seek, such as monetary damages. See Booth v.

28

_Churner_, 532 U.S. 731, 736-41 (2001). However, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." _Moore_, 517 F.3d at 725. In this regard, the Supreme Court has identified three circumstances wherein an administrative remedy qualifies as unavailable: (i) "it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (ii) it remains "so opaque that it becomes, practically speaking, incapable of use"; or (iii) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." _Ross v. Blake_, 578 U.S. 632, 643-44 (2016). "The burden of showing that administrative remedies were unavailable lies with the plaintiff." _Mann v. Scott_, Civil Action No. 0:14-3474, 2015 WL 5165198, at *4 (D.S.C. Sept. 1, 2015) (citing _Graham v. Gentry_, 413 F. App'x 660, 663 (4th Cir. 2011)); _see also_ _Graham_, 413 F. App'x at 663 ("[I]n order to show that a grievance procedure was not 'available,' a prisoner must adduce facts showing that he was prevented, through no fault of his own, from availing himself of that procedure.").

### II. Analysis

### A. Officer Copple

As a preliminary matter, Defendants assert that "Plaintiff failed to exhaust his administrative remedies regarding Officer

29

Copple allegedly applying restraints too tightly." (Docket Entry 52 at 21 (emphasis omitted).) Plaintiff maintains that he "exhausted [his] grievances [to] step three" for grievances "#12692 [and] #12694" in which he "stated [that M.L.] assaulted and rape[d him] in his cell on [November 15,] 2019." (Docket Entry 59 at 7.) Plaintiff further asserts: "[He] was seen by medical for the bruises caused by [his] handcuffs and leg iron be[ing] applied too tightly by Officer Copple but a grievance was filed but la[t]er rejected by prison staff because you can only file one grievance at a time." (Id.)

NCDPS provides a three-level Administrative Remedy Procedure. (See Docket Entry 52-1 at 119 to 129.) Under the ARP, "[a]n inmate may submit a new grievance after a pending grievance has completed Step 2 review or has been resolved." (Id. at 121 ("Section .0304(b)").) If an inmate submits a grievance in violation of this provision, "the screening officer may return the grievance to the inmate with written notification on the [grievance form] that it may be resubmitted when the current grievance in process completes Step 2." (Id. at 126.) Notwithstanding this policy, "[n]o inmate grievance alleging sexual abuse or harassment shall be rejected." (Id. at 121.)

Here, Plaintiff pursued two grievances related to the incident on November 15, 2019, through Step Three of the ARP. (See, e.g., id. at 85-93.) These grievances do not mention Officer Copple's

alleged too-tight application of restraints; indeed, although they mention negligence, deliberate indifference, "cruel and unusual punishment," and "the Due Process Clause of the Fourteenth Amendment" (id. at 91), they lack any reference to restraints or excessive force. (See id. at 86, 91.) As such, these grievances do not "alert the prison to the nature of the wrong for which [Plaintiff seeks] redress" through his excessive force claim against Officer Copple and thus do not satisfy the administrative exhaustion requirement for that claim. Wilcox v. Brown, 877 F.3d 161, 167 n.4 (4th Cir. 2017) (brackets and internal quotation marks omitted).

Plaintiff does not contend otherwise; instead, he maintains that he submitted a grievance about Officer Copple's alleged actions, but that NCDPS staff rejected that grievance because he had another then-pending grievance. (See Docket Entry 59 at 7 (explaining that prison staff rejected relevant grievance "because you can only file one grievance at a time").) In support of this assertion, Plaintiff submitted the screening responses to Grievance Numbers 4860-2019-KPODF-11801 and 4860-2019-KPODF-11817. (See Docket Entry 59-3 at 11 to 12.) Notably, the referenced responses predate both the incident on November 15, 2019, and Plaintiff's incarceration at Southern Correctional Institution; thus, they provide no support for Plaintiff's (unsworn) assertion that he attempted to grieve Officer Copple's alleged use of excessive force

at Southern Correctional Institution in November 2019. (See id. (bearing dates received of September 25, 2019, and September 30, 2019, and identifying Plaintiff's location as "Scotland CI" (emphasis omitted)).) In any event, NCDPS's rejection of a grievance under Section .0304(b) neither satisfies the exhaustion requirement nor, in and of itself, renders the administrative review process "unavailable" to an inmate. See, e.g., Moore, 517 F.3d at 729-30 (explaining that, where NCDPS staff returned the plaintiff's "gout grievance . . . because it was submitted while his Hepatitis C grievance, filed 12 days earlier, was still pending," in violation of the ARP's one-pending-grievance rule, that grievance "did not serve to exhaust [the plaintiff's] remedies," and holding that, "[b]ecause [the plaintiff] had no excuse for not resubmitting the [gout] grievance on or after June 5, 2003, when Step 2 of his Hepatitis C grievance was completed, the district court properly concluded that [the plaintiff] failed to exhaust his available remedies regarding his gout claim").

The record thus establishes that Plaintiff failed to exhaust his administrative remedies on his excessive force claim against Officer Copple. Accordingly, the Court should dismiss this claim without prejudice for failure to exhaust administrative remedies.[12]

---

12 Notably, even assuming the veracity of Plaintiff's asserted attempt to submit a grievance regarding Officer Copple's allegedly too-tight restraints, the record lacks any indication that Plaintiff could not timely resubmit such grievance after the
(continued...)

32

## B. Officer Smith

Next, Plaintiff contends that Officer Smith violated his rights by (i) "fail[ing] to act or respond in a timely fashion" after "witness[ing M.L.] enter [Plaintiff's] cell per policy a[n] unauthorized sleeping area" (Docket Entry 59 at 1) and (ii) "open[ing Plaintiff's] cell door [and] in doing so allow[ing him] to be assaulted" (id. at 3). Conversely, Defendants contend that the record establishes Officer Smith's lack of "personal involvement in the fight between Plaintiff and [M.L.]," save for promptly "call[ing] for assistance after seeing [Plaintiff and M.L.'s fight] spill out into the dayroom." (Docket Entry 52 at 11;

_____

12(...continued)
prior grievance cleared Step Two, rendering this case distinguishable from the Fourth Circuit's recent decision in Griffin v. Bryant, No. 21-7362, __ F.4th __, 2022 WL 17957455 (4th Cir. Dec. 27, 2022). See, e.g., id. at *7 (reversing grant of summary judgment for failure to exhaust administrative remedies on "sedation" grievance, explaining that "an abundance of loose ends feed into the question of whether administrative remedies were functionally available to [the plaintiff]" regarding that grievance, including why his initial "Kosher diet grievance [was] left to languish in the system after it had been favorably resolved almost immediately," why officials "accept[ed] and respond[ed] to [his post-sedation-grievance] inadequate care grievance, in plain contravention of their 'one-grievance-at-a-time' policy," and why "the apparently moot Kosher diet grievance [was] suddenly forwarded to 'Step 2' in February 2016, just days before the supposed filing deadline for the sedation grievance," and concluding that although "[t]he facts of record present the actual possibility that [the plaintiff] faced 'a real world "Catch 22," a dilemma from which there is no escape, one in which the only solution is denied by a circumstance inherent in the problem[,]' . . . the record leaves too much to speculation for [the Fourth Circuit] to now decide that [the plaintiff's] failure to exhaust the grievance procedure's remedies should be excused because those remedies were not, in truth, 'available' to him").

33

see also id. at 10-13; Docket Entry 61 at 4-5.) Defendants'
position should prevail.

Put simply, the surveillance video establishes that Plaintiff,
not Officer Smith, opened his cell door to permit M.L.'s entrance.
(See Video at 8:24:48-8:27:36.) Moreover, Plaintiff's Declaration
lacks any indication that his assertion that Officer Smith
"fail[ed] to act in a timely fashion" (Docket Entry 59 at 10; cf.
Docket Entry 52-2, ¶ 3 (Officer Smith averring that she called for
assistance when she "noticed a fight between [M.L.] and
[Plaintiff]" as she "was working in the Control Booth for the
Falkland Unit")) "is based on any personal knowledge by [Plaintiff]
of [Officer Smith's actions in response to Plaintiff and M.L.'s
altercation]. As a result, [the Court is] unable to accept th[ose]
allegation[s] as probative evidence." Williamson v. Stirling, 912
F.3d 154, 172 (4th Cir. 2018). In any event, the surveillance
video reveals that a mere thirty-two seconds elapse between the
start of Plaintiff and M.L.'s physical altercation and the entry of
the first prison official into their cellblock, and, indeed, less
than a minute elapses between the time that M.L. (calmly) stands up
from the table to approach Plaintiff's cell and the entry of that
official. (See Video at 8:27:17-8:28:11.) As such, the record
fatally undermines Plaintiff's contention that Officer Smith acted
with deliberate indifference to Plaintiff's safety on November 15,

34

2019. The Court should thus grant summary judgment in Officer Smith's favor.

### C. Sergeant Jernigan

As an initial matter, it remains unclear whether Plaintiff seeks to assert a deliberate indifference or an excessive force claim against Sergeant Jernigan for his alleged post-altercation actions. For instance, Plaintiff's Declaration states:

> Officer[] Copple[] and Sgt. Jernigan place[d] me in restraints after I was pepper sprayed injured in pain and took me to a decontamination, a hot shower with my clothes and the handcuffs still on I was in agony and pain my right eye was cut laceration my lip was deeply cut my top and bottom teeth were knock[ed] out during the assault that [is] when I told Officer[] Copple I was rape[d] sexually assaulted by inmate [M.L.], 5 hours later I was taken to a hospital it was to[o] late to save my teeth the officers pick[ed] up of[f] my cell floor They took my wet clothes finally and told me a police [officer] was going to talk with you.

(Docket Entry 59 at 11.)

In his briefing, however, Plaintiff argues, inter alia:

> It took Southern Correctional Staff 5 hours to get [Plaintiff] to a hospital as a result of this [Plaintiff] lost three of his teeth that were knock[ed] out in his cell by [M.L.] Staff Sgt. Jernigan Officer[] Copple are legally liable by negligent breaching the duty of care and failure to shield and protect while in the custody of the D.P.S. [Plaintiff] was place[d] in a hot shower with his clothes still on as part of the decontamination process by Sgt. Jernigan, and Officer[] Copple This cruel and unusual punishment a[n] Eighth Amendment violation [Plaintiff] suffered agony and pain as a result of staff actions This can be proven at a jury trial in favor of the non[-]moving party as legal evidence This cruel deed is more than mere allegations Being place[d] in a hot shower after being injured through a violent assault and

35

> rape [Plaintiff] suffered both mentally and physically
> through deprivation and neglect . . . .

(Id. at 8.)

Regardless of whether Plaintiff asserts an excessive force or a deliberate indifference claim against Sergeant Jernigan for his post-altercation actions, however, such claim fails. To the extent Plaintiff seeks to hold Sergeant Jernigan liable for the purported five-hour delay in providing (outside) medical treatment, Plaintiff provides no evidence that Sergeant Jernigan bears responsibility for that delay. Instead, Plaintiff avers only that, after reporting the alleged rape to Officer Copple during the post-altercation decontamination, "5 hours later [Plaintiff] was taken to a hospital." (Id. at 11.) Plaintiff does not identify the individual(s) responsible for this five-hour delay. (See id.) Rather, he generically argues that "[i]t took Southern Correctional staff 5 hours to get [Plaintiff] to a hospital," resulting in the "los[s of] three of [Plaintiff's] teeth that were knock[ed] out in his cell by inmate [M.L.]." (Id. at 8 (emphasis added).) Conversely, Plaintiff specifically contends that he "was place[d] in a hot shower with his clothes still on as part of the decontamination process by Sgt. Jernigan[] and Officer[] Copple," which he describes as "cruel and unusual punishment." (Id. (emphasis added).)

For his part, Sergeant Jernigan avers that, after the fight between Plaintiff and M.L., "[t]he medical department was promptly

36

notified that both offenders needed a medical evaluation." (Docket Entry 55-1, ¶ 4; accord id., ¶ 6 ("After the fight ended, the medical department was promptly notified that both offenders needed to be medically evaluated" even though "[n]either offender looked seriously injured beyond the typical injuries associated with a fight (bumps, bruises, scrapes), except that [Plaintiff] was missing some teeth.").) Sergeant Jernigan further avers that, upon Plaintiff informing him of the alleged rape during the post-altercation decontamination process, Sergeant Jernigan "immediately notified the Officer-in-Charge, Lt. Goodwin and medical about the allegations." (Id., ¶ 4.)

"Section 1983 authorizes a plaintiff to sue for an alleged deprivation of a federal constitutional right by an official acting under color of state law." Williamson, 912 F.3d at 171 (internal quotation marks omitted). "To establish personal liability under § 1983, however, the plaintiff must affirmatively show that the official charged acted personally in the deprivation of the plaintiff's rights. That is, the official's own individual actions must have violated the Constitution." Id. (brackets, citation, and internal quotation marks omitted). "Importantly, mere knowledge of such a deprivation does not suffice." Id.

Because the evidence, even construed in Plaintiff's favor, remains "insufficient to show that [Sergeant Jernigan] was personally involved in any" delay in providing (outside) medical

37

treatment to Plaintiff, "no reasonable trier of fact could find that [Sergeant Jernigan's] 'own individual actions' violated the Constitution." Id. at 172. "Accordingly, [Sergeant Jernigan is] entitled to summary judgment on [any medical deliberate indifference claim] because [he] lacked sufficient personal involvement in the alleged constitutional deprivation[.]" Id.

Further, to the extent Plaintiff pursues an excessive force claim against Sergeant Jernigan for his post-altercation actions, it falters under qualified immunity. (See generally Docket Entry 52 at 28-29 (arguing for summary judgment based on qualified immunity).) "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "The protection extends to all but the plainly incompetent or those who knowingly violate the law." Raub v. Campbell, 785 F.3d 876, 881 (4th Cir. 2015) (internal quotation marks omitted). Under this doctrine, "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Id. (brackets in original) (internal quotation marks omitted).

In evaluating qualified immunity, courts consider "(1) whether the plaintiff has established the violation of a constitutional

right, and (2) whether that right was clearly established at the time of the alleged violation." Id.  The Court may address these prongs in whatever order "will best facilitate the fair and efficient disposition of [this] case." Pearson, 555 U.S. at 242.  Here, consideration of the latter prong first appears appropriate.  See id. at 237 (recognizing potential propriety of initial consideration of latter prong for "cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right").

A right qualifies as "clearly established" if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001), overruled in part on other grounds by Pearson, 555 U.S. at 227.  In other words, "[t]he unlawfulness of the action must be apparent when assessed from the perspective of an objectively reasonable official charged with knowledge of established law." Lopez v. Robinson, 914 F.2d 486, 489 (4th Cir. 1990).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987) (citation omitted).  In ascertaining whether a right qualified as clearly established at the time of the challenged conduct, courts within this circuit generally "need not

39

look beyond the decisions of the Supreme Court, th[e Fourth Circuit], and the highest court of the state in which the case arose." Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999) (internal quotation marks omitted). However, in the absence of controlling precedent, a right may qualify as clearly established (i) if it appears "manifestly included within more general applications of the core constitutional principles invoked" or (ii) based on "a consensus of cases of persuasive authority from other jurisdictions." Booker v. South Carolina Dep't of Corr., 855 F.3d 533, 538-39 (4th Cir. 2017) (emphasis and internal quotation marks omitted). Conversely, decisions from other jurisdictions that decline to find constitutional violations in similar circumstances can justify application of qualified immunity, in the absence of controlling authority. See Pearson, 555 U.S. at 244-45.

As of November 2019, appellate courts, including the Fourth Circuit, had repeatedly held that a prison official could violate the Eighth Amendment by refusing to permit an inmate to wash after pepper spraying. See, e.g., Williams v. Benjamin, 77 F.3d 756, 765 (4th Cir. 1996) (reversing grant of summary judgment to guards who "refused to wash off the mace or permit [the plaintiff] to wash himself, informing him that he would not get a shower and that the mace was 'his problem'"); Walker v. Bowersox, 526 F.3d 1186, 1189 (8th Cir. 2008) (reversing grant of summary judgment to officer where officer pepper sprayed inmate, who "was not allowed to shower

40

or have clean clothes or bedding for three days and could only wash in his cell sink"); Norton v. City of Marietta, 432 F.3d 1145, 1154 (10th Cir. 2005) ("Whether defendants' use of the spray was objectively harmful enough to violate plaintiff's Eighth Amendment rights turns in part on how long plaintiff was sprayed and whether he was adequately irrigated afterwards or left to suffer unnecessarily."); Foulk v. Charrier, 262 F.3d 687, 701-02 (8th Cir. 2001) (affirming jury verdict against officer who "sprayed pepper spray directly into [inmate's] face," where inmate "received no medical care and had no ability to wash off the pepper spray"); see also Iko, 535 F.3d at 241 ("The district court denied the officers qualified immunity on [the plaintiff's deliberate indifference] claim, noting that the officers' training and existing case law at the time required decontamination after the use of such an irritant [(i.e., pepper spray)]. We agree."). Under the circumstances, "it would [not] be clear to a reasonable officer that [promptly placing Plaintiff in a shower to decontaminate after officers pepper-sprayed him] was unlawful." Saucier, 533 U.S. at 202. Thus, qualified immunity shields Sergeant Jernigan from Plaintiff's post-altercation excessive force claim. See id.

Finally, Plaintiff argues that, by pepper spraying him, "Sgt. Jernigan . . . used excessive force when the unit manager, Mrs[.] Harris[,] call[ed] a code 4 on Franklin Unit." (Docket Entry 59 at 16.) More specifically, Plaintiff avers:

> [When M.L.] tried to rape [him,] . . . [Plaintiff]
> push[ed M.L.] away and quickly pull[ed] up [his] pants[,
> but M.L.] struck [Plaintiff] in the mouth and knock[ed]
> out [Plaintiff's] teeth and cut [his] lip [and
> Plaintiff's] right eye was badly damaged[.] This was not
> a fight in general [M.L.] tried to rape [Plaintiff].
> When Sgt. Jernigan, and Sgt. Willoughby, was ordered to
> pepper spray [Plaintiff] by the unit manager Mrs.
> Harris[, M.L.] was on top of [Plaintiff] holding [him]
> down on [his] cell bunk bed. Per policy[,] he was in
> a[n] unauthorized cell[.]

(Id. at 10.)

As relevant to this contention, the video establishes that Plaintiff and M.L. engaged in a mutual physical altercation that moved between Plaintiff's cell and the cellblock dayroom. They remained engaged in this physical altercation when prison officials, including Sergeant Jernigan, arrived on the scene. Thirty-six seconds after Sergeant Jernigan arrived at Plaintiff's cell, he escorted a handcuffed Plaintiff through his cell door and then out of the cellblock.

The uncontradicted evidence further establishes that:

Plaintiff and M.L. disregarded multiple orders to stop fighting, prompting Unit Manager Harris's order to "administer OC Pepper Spray as a means of stopping the fight." (Docket Entry 55-1, ¶ 4.) Sergeant Jernigan "administered one one-second burst of OC Pepper Spray and Sgt. Willoughby also administered OC Pepper Spray." (Id.) "After both offenders were sprayed with OC Pepper

42

Spray, they stopped fighting." (Id.)[13] Staff then handcuffed M.L. and Plaintiff and took them "to restrictive housing to be decontaminated." (Id.) Sergeant Jernigan helped escort Plaintiff "to a decontamination, a hot shower." (Docket Entry 59 at 11; see also Docket Entry 55-1, ¶ 4.) Additionally, "[t]he medical department was promptly notified that both offenders needed a medical evaluation." (Docket Entry 55-1, ¶ 4.)

"[I]t is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas[,] or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain." Iko, 535 F.3d at 240 (internal quotation marks and emphasis omitted). Yet, pepper spray "is not per se a cruel and unusual punishment," McCargo v. Mister, 462 F. Supp. 813, 818 (D. Md. 1978), and officers can use it, in limited quantities, "to control a recalcitrant inmate" without violating the Eighth Amendment, Williams, 77 F.3d at 763 (internal quotation marks omitted).

Here, construing the evidence in the light most favorable to Plaintiff,

---

13    Plaintiff argues that, when he "was injured beaten helpless with [M.L.] on top of [him], [he] was sprayed when [he] pose[d] no threat to staff or inmate in [his] cell." (Docket Entry 59 at 20.) However, as Plaintiff did not swear to its truthfulness or otherwise make this contention under penalty of perjury, it does not constitute admissible evidence for summary judgment purposes. See Reeves, 2011 WL 4499099, at *5 n.14.

no reasonable jury could find that [Sergeant Jernigan's] use of force was applied maliciously and sadistically for the very purpose of causing harm. As further explained below, the factors articulated in *Whitley* weigh heavily in [Sergeant Jernigan's] favor: there was a need for force, and in light of the perceived threat and [Sergeant Jernigan's] efforts to temper the force used, the force[] used was proportional to the need for it. Taken as a whole, analysis of the *Whitley* factors shows that [Sergeant Jernigan] applied force in a good faith effort to maintain or restore discipline. *See[,] e.g.*, *Kitchen v. Ickes*, 116 F. Supp. 3d 613, 628-29 (D. Md. 2015) (finding that the officer's "use of pepper spray [on prisoner who failed to comply with orders to stop fighting] was not excessive in relation to the need to restore order and protect the inmates"), *aff'd*, 644 F. App'x 243 (4th Cir. 2016); *Hicks v. Simpkins*, 2006 WL 2303179 (W.D. Va. Aug. 9, 2006) (finding no excessive force where inmate was sprayed with pepper spray after twice disobeying a direct order to return to his cell).

Geddings v. Roberts, No. 1:15cv264, 2018 WL 1626116, at *10 (M.D.N.C. Mar. 30, 2018) (final set of brackets in original) (certain italicization added).

As for the first three Whitley factors, "the need for the application of force," "the relationship between the need and the amount of force that was used," and "the extent of any reasonably perceived threat that the application of force was intended to quell," Iko, 535 F.3d at 239 (internal quotation marks omitted), the record establishes that, at the time Sergeant Jernigan utilized pepper spray, Plaintiff and another inmate remained engaged in a physical altercation, which had previously spilled into a prison dayroom containing multiple other unrestrained inmates.[14] The

_____

14  Although he asserts, in passing, that "[he] acted on in
                                                    (continued...)

44

record further reflects that, after verbal commands failed to halt this ongoing fight, Sergeant Jernigan administered a single, one-second burst of pepper spray.  (See Docket Entry 55-1, ¶ 4.) Finally, the record reveals that less than forty seconds elapse between the time that Sergeant Jernigan arrives on the scene of the fight until he escorts a handcuffed Plaintiff out of his cell.

"Violent and disruptive situations within a jail or correctional setting — such as [P]laintiff's fight with [M.L.] — present obvious threats to jail security." Segura v. Cherno, No. 6:21-cv-740, 2022 WL 3587860, at *6 (D. Or. May 25, 2022), report and recommendation adopted, No. 6:21-cv-740, 2022 WL 3586721 (D. Or. Aug. 22, 2022); see also, e.g., Robison v. Testa, No. 1:20-cv-263, 2021 WL 5770211, at *4 (W.D. Pa. Dec. 6, 2021)

---

14(...continued)
[sic] self defense when [M.L.] violated his house, a cell" (Docket Entry 59 at 19), Plaintiff does not clearly explain what he means by his assertion that "[t]his was not a fight in general" (id. at 10 (maintaining, immediately thereafter, that "[M.L.] tried to rape [Plaintiff]")).  (See id. at 1-22.)  However, in his grievances regarding the incident, Plaintiff asserts that "[t]his was not a fight, or a mutual confrontation, but a sexual assault."  (Docket Entry 52-1 at 91.)  As an initial matter, the video establishes that M.L. neither raped nor attempted to rape Plaintiff.  In any event, Plaintiff's Declaration neither disputes that he physically resisted M.L. nor provides any evidence indicating that Sergeant Jernigan would have known that Plaintiff, for instance, merely engaged in self-defense against an unprovoked attacker rather than actively participated in a mutual fight with another inmate (see Docket Entry 59 at 9-12).  Significantly, though, "[i]n applying the third Whitley factor, [the Court] must consider the extent of any threat posed by [Plaintiff] to the staff or other inmates, as reasonably perceived by [Sergeant Jernigan] based on the facts known to him at the time."  Tedder v. Johnson, 527 F. App'x 269, 273 (4th Cir. 2013) (emphasis added).

45

("[Inmates'] ongoing fight placed both men at risk of serious injury.  If allowed to continue, the altercation also could have spread to the other inmates and detainees who were present in the day room."); Quinones v. Rollison, No. 18-cv-1170, 2020 WL 6420181, at *4 (S.D.N.Y. Nov. 1, 2020) (observing that an inmate's "violent fight" with another inmate "posed a risk to other inmates, himself, [the responding officer], and other prison staff" ).  Moreover, the evidence establishes that Plaintiff and M.L. refused multiple orders to cease fighting.  (See Docket Entry 55-1, ¶ 4.) "Plaintiff's undisputed refusal to comply with [those orders] justified some need for force to restore order." Geddings, 2018 WL 1626116, at *10 (explaining that "[c]ase law . . . support[s] that '[a] prisoner's failure to comply with an officer's order permits the officer to use some measure of force to gain the prisoner's compliance or to respond to a threat that arises because of the prisoner's failure to comply'" (final set of brackets in original)).  Accordingly, the first three Whitley factors weigh in Sergeant Jernigan's favor.  See id. at *10-11; see also, e.g., Robison, 2021 WL 5770211, at *4 (concluding that, where officer's "verbal commands proved inadequate to stop the violence, [his] decision to escalate to the use of OC spray was objectively reasonable," such that "'the relationship between the need for the use of force and the amount of force used'" factor favored officer); Kitchen, 116 F. Supp. 3d at 628 (finding that, where

46

inmates refused orders to stop fighting, officer's "use of pepper spray was not excessive in relation to the need to restore order and protect the inmates who continued to fight," and explaining that, "[e]ven if [the p]laintiff had released his cellmate prior to [the officer] deploying the pepper spray as [the p]laintiff claims, and even if [the officer] deployed the entire can of pepper spray, there is simply no evidence that in the brief interlude of the altercation, viewed through the cell door slot, that [the officer] was objectively aware that [the p]laintiff and his cellmate had complied with the numerous orders to disengage and subjectively perceived that the use of pepper spray in the amount deployed was no longer necessary to restore order").

The final factor, "any efforts made to temper the severity of a forceful response," Whitley, 475 U.S. at 321 (internal quotation marks omitted), likewise favors Sergeant Jernigan. Here, officers repeatedly ordered Plaintiff and M.L. to cease fighting, without success, before Sergeant Jernigan deployed a single, one-second burst of pepper spray. "[B]ecause a limited use of [pepper spray] constitutes a relatively 'mild' response compared to other forms of force, the initial application of [pepper spray] indicates a 'tempered' response by the prison officials," Williams, 77 F.3d at 763, particularly given that officers resorted to pepper spray only after Plaintiff and M.L. refused to comply with multiple orders to cease fighting.

47

Under the circumstances, "no reasonable jury could find that [Sergeant Jernigan's] use of force was applied maliciously and sadistically for the very purpose of causing harm." Geddings, 2018 WL 1626116, at *10.[15]  The Court should therefore grant summary judgment to Sergeant Jernigan on each of Plaintiff's claims.

**CONCLUSION**

The record establishes that Officer Smith and Sergeant Jernigan did not violate Plaintiff's constitutional rights.  In addition, Plaintiff failed to exhaust his claims against Officer Copple.

**IT IS THEREFORE RECOMMENDED** that Plaintiff's Motion (Docket Entry 58) be denied and Defendants' Motion (Docket Entry 51) be granted as follows:  summary judgment should entered in favor of Officer Smith and Sergeant Jernigan and Plaintiff's claims against Officer Copple should be dismissed without prejudice for failure to exhaust administrative remedies.

This 9th day of January, 2023.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

---

15  Accordingly, the Court need not analyze whether Plaintiff satisfies the objective component of an eighth-amendment excessive force claim.